Filed 4/19/22  P. v. Medrano CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B312576 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA084749) |
| v. | |
| ANTHONY JAMES MEDRANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed in part, reversed in part, and modified.

Richard B. Lennon and David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Anthony James Medrano guilty of first degree murder, willful, deliberate, and premeditated attempted murder, aggravated mayhem, and simple mayhem, after he attacked two older men in a North Hollywood park, killing one and badly injuring the other. Medrano contends: (1) the trial court prejudicially erred by failing to instruct the jury on heat of passion voluntary manslaughter; (2) his conviction for simple mayhem must be reversed because it is a lesser included offense of aggravated mayhem; (3) the abstract of judgment must be modified to accurately reflect the jury's verdict; and (4) he is entitled to one additional day of custody credit. Medrano's second and fourth contentions have merit; his first does not. Accordingly, we order the simple mayhem conviction reversed, which moots Medrano's third contention. We otherwise affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Facts*

    a. *The crimes*

In November 2016, Federico V. was 68 years old and retired. He and his wife of 48 years lived near the Victory Vineland Recreation Center park in North Hollywood. Federico often went for early morning walks and visited the park to collect recyclables. The park had a soccer field, a basketball court, a tennis court, a playground, and a recreation center building.

At approximately 6:00 a.m. on November 12, 2016, Rolando V.[1], who was approximately 73 years old, was sitting on a bench in the park after collecting recyclables, or while waiting for his

---

[1] Both victims had the same last name, but they were not related to each other and did not know each other.

brother before the men headed to work at a recycling center.[2]  He was not armed with a weapon.

Rolando had seen Federico in the park previously, collecting recyclables.  That morning, he saw Medrano and Federico near the park's basketball court.  Medrano was about 20 meters away from Federico.  Federico was holding his hands on his head, and then was lying down on the grass.  Rolando did not realize Federico was injured; he thought he was simply tired.

Medrano then walked up to Rolando and told him to go to the basketball court.  Rolando refused, and Medrano stabbed him in the chest with a knife.  Rolando pushed Medrano away with his legs, and ran.  Medrano caught up to him; tripped him, causing him to fall to the ground; straddled him; beat him; and said " 'I'm going to kill you, fucker.' "  Rolando pinned Medrano's arm to prevent him from using the knife again.  Medrano attempted to gouge out Rolando's eyes, head-butted Rolando's face multiple times, and bit Rolando's ear, partially severing it.  Rolando succeeded in gaining control of the knife and threw it into an area where the grass was tall.  Medrano got up and went to search for the knife in the grass.  Rolando called 911.  A recording of his call was played for the jury.

      b.  *The investigation*

Multiple police officers arrived in response to the call.  They observed Medrano crawling in the grass, apparently looking for something.  When he rolled over, officers saw he had a knife in

---

[2]    At trial, Rolando testified he was waiting for his brother.  However, he told a detective that he was homeless and had been collecting recyclables in the park that morning.

3

his hand.[3]  After being ordered multiple times to drop the knife, Medrano complied.  He was handcuffed, and an officer recovered the knife.  His clothing was bloody.  Medrano stated that he thought the officers were there to help him or save him.  A detective found a second knife, sometimes referred to in the record as a "butter knife," on the ground in a picnic area.

Officers found Rolando sitting with his back against a wall.  He was covered in blood and his ear was dangling away from his head.  His eyes were swollen shut, "bulging out," and he had bite marks on his head.  He identified Medrano as his attacker and the recovered knife as the weapon Medrano had used.

An ambulance transported Rolando to the hospital.  When he arrived he was in extremis, near collapse and death.  A stab wound to his upper left chest had penetrated his lung and the sac around the heart, causing his lung to partially collapse.  The top portion of his ear was bitten off, resulting in a permanent deformity.  A tube was placed in his chest and he underwent surgery on his ear.  The attack left him blind in one eye, and he lost a tooth.  He remained in the hospital for approximately ten days, until November 21, 2016.

Officers found Federico in the park's soccer field, deceased and lying face down, with blood on his head and face.  Plastic bottles were scattered near his body and throughout the soccer field.  An autopsy revealed that his death was a homicide, caused by multiple sharp force injuries.  He had suffered seven stab wounds, one of which entered his left upper chest, punctured his left lung and his heart, and was fatal.  He also suffered 11 "sharp

---

[3]     This knife is sometimes described in the record as a steak knife.

incised wounds." His injuries were consistent with him being stabbed in the chest, attempting to run away, falling, and the attacker then inflicting the remaining wounds. In the medical examiner's opinion, Federico was standing when he was stabbed. He had no defensive injuries.

DNA analysis showed that blood on Medrano's shoes, clothes, and mouth matched Rolando's DNA profile. No blood was detected on the butter knife. Blood was detected on the steak knife that officers recovered from Medrano. Due to the complexity of the data, partial DNA typing results on the steak knife blade and handle were inconclusive and not suitable for comparison.

c. *Medrano's police interview*

Medrano was treated at a hospital for a laceration to his hand, which was sutured. He also had a scrape on his thumb, but no other injuries. He had blood on his face. Two Los Angeles Police Department detectives advised Medrano of his *Miranda*[4] rights and then conducted a videotaped interview with him at approximately 11:00 a.m. that morning, which was played for the jury. Medrano admitted stabbing both victims at the park, and biting one of them. During the interview, Medrano gave the detectives a false name, a false birth date, and a false name for his mother. He claimed to be 15 years old, but was actually 29.

Medrano said he had been living in the park for approximately two weeks. When he awoke on the morning of the attack, he felt the day "wasn't right." He saw the two victims, whom he believed were only pretending to collect recyclables and were really in the park to "rape people right there or something."

_____

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436.

He thought the men were evil and were not supposed to be in the park.  They were a threat to park patrons and looked sick and weird, like demons or zombies.  He felt it was his job or mission to "take care of the evil" and "take him out."

He approached the first victim, Federico, and told him he was not supposed to be there.  Medrano said, "What are you doing here at this . . . random time, weirdo?"  When Federico replied by asking who Medrano was, Medrano punched him.  Federico ran, and Medrano chased him.  Medrano did a "leg sweep," causing Federico to fall, and then wrestled with him for a "cool minute."  He then purposely stabbed Federico in the heart with a butter knife in self-defense.[5]  He stabbed the victim in "every technical spot I could, you know.  Easy . . . access."

Medrano then turned his attention to Rolando, who was sitting on a bench.  Believing Rolando and Federico were "in cahoots," Medrano approached Rolando and told him he should not be in the park.  The men began wrestling.  When Medrano got tired, he stabbed Rolando, bit his ear, and gouged out his eyes.  He aimed for Rolando's chest or aorta, directing his attack to hit "vitals."  Initially Medrano stated that he used the same butter knife he had used to stab Federico.  When informed that the officers had found the butter knife in another area of the park, he stated that Rolando must have had a different knife on his person and Medrano took it away from him.

Medrano claimed that both victims displayed superhuman strength.  He attacked both of them in self-defense even though

_____

[5]     Medrano stated that the butter knife was "just laying around."  His statements to police were unclear regarding whether he picked it up off the ground, or whether Federico had it and he took it from Federico.

they were yards away from him.  He felt his life was in danger, and they had invaded his privacy and his space.  He claimed the stabbings were "necessary."  His stabbing motions were "tactical maneuvers."  His intent was to achieve "salvation."  He "had to do what [he] had to do to survive."  He suggested that the victims' blood, which was on his clothing and face during the police interview, was not human blood.  He repeatedly stated that his actions were good:  "I know what I did was right" and "I did what I did for good, not for evil."

d. *Medrano's defense at trial*

Medrano's father, Moris Medrano,[6] testified that Medrano had lived at home his entire life.  The family's residence was located within approximately a half mile of the park.  On November 9, 2016, Moris kicked Medrano out because he had violated a curfew.  Medrano had been boxing since he was 11 years old, and Moris was his coach.  In 2016, Medrano was training to become a professional boxer.

Medrano testified on his own behalf at trial, as follows.  He was a trained boxer.  He had been sleeping in the park for three days after being kicked out of the house.  As part of his training to become a boxer, he was attempting to drop his weight from 160 to 132 pounds.  Because he had safety concerns, he tried to stay up all night and sleep during the day.

On November 11, he stayed up all night.  At 4:00 a.m. on November 12, he left his belongings in a safe spot behind a bin and went for a four-mile run.  He returned to the park, retrieved his things, washed in the park's restroom, and changed his

---

[6]     Because appellant and his father share the same last name, we refer to Moris Medrano by his first name.

clothes.  He then placed his things by the bin again, went to the other side of a fence, and fell asleep.  He was not armed with a weapon.  He awoke to find Federico groping his thigh.  He panicked and felt scared and alarmed.  He began hyperventilating and couldn't breathe.  Medrano got up and confronted Federico, asking "what was his problem?"  Federico swung his bag of recyclables at Medrano and became "very aggressive."  He grabbed Medrano, and Medrano struggled to get him off.  Federico pushed Medrano down a nearby slope, causing him to fall.  Medrano was "really scared."

While on the ground, Medrano looked around for something he could use to defend himself, and found a knife.  When Federico approached him again, Medrano stabbed Federico once in the chest.  Federico fell on top of Medrano.  Medrano got on top of Federico and "frantically start[ed] stabbing him in the back."  Medrano was "really scared.  I'm in shock.  I don't know what's going on."  When asked what he was thinking while stabbing Federico, he testified, "I just want the man to stop.  To stop coming towards me."  He eventually stopped stabbing Federico because "[i]t was enough."  Federico got up and began stumbling.  Medrano stayed back because he was having an asthma attack.

Medrano then looked over toward where he left his property and saw Rolando going through his bags.  He thought Rolando was going to take his things.  He ran over and confronted Rolando, asking "what was his problem" and "why was he taking my stuff."  Rolando was very aggressive, did not respond to Medrano's query, and was "very mad."  Medrano was "beyond scared."  Rolando threw Medrano's bags down.  Rolando had a knife and rushed toward Medrano.  Medrano tried to take the knife away from him.  Medrano still had in his pocket the

knife he had used to stab Federico.  The two men struggled. When Rolando refused to drop the knife, Medrano stabbed him once in the chest.  Medrano moved to another area of the park and Rolando followed him.  Medrano was "really scared" because he thought Rolando would have backed off after being stabbed. When Rolando got too close, Medrano "couldn't breathe."  He was "having a serious asthma attack."  So he decided to "take [Rolando] down once."  Medrano tripped him.  Rolando bit Medrano's hand and wouldn't let go.  Medrano responded by headbutting and kicking him.  Rolando grabbed Medrano's genitals.  To get Rolando off him, Medrano bit him once on the top of his head.  Medrano managed to break free, ran to the front of the park, and decided to lie down.  He was tired.  He looked up and saw Rolando still heading toward him, so Medrano began crawling away.  The police arrived.  He was taken to the hospital and then into custody.  He was sad, in shock, confused, and "felt violated."  He was the victim, not the men he stabbed.

During his police interview, Medrano was still sad, in shock and confused.  He gave his son's name as his own because he was thinking about his son.  He admitted suffering prior convictions for petty theft, false personation, and making criminal threats.

2. *Procedure*

Trial was by jury.  Medrano was convicted of the first degree murder of Federico (Pen. Code, § 187, subd. (a));[7] the attempted willful, premeditated, and deliberate murder of Rolando (§§ 664, 187, subd. (a)); simple mayhem (§ 203); and aggravated mayhem (§ 205).  The jury also found true allegations

_____

[7]     All further undesignated statutory references are to the Penal Code.

9

that Medrano personally used a deadly weapon in the murder and attempted murder (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury on Rolando (§ 12022.7, subd. (a)). In a bifurcated proceeding, the trial court found true allegations that Medrano had suffered a prior conviction for making criminal threats, a "strike" and a serious felony (§ 667, subds. (a), (b)–(i)).

The trial court denied Medrano's *Romero* motion[8] and sentenced him, pursuant to the Three Strikes law, to 50 years to life for the murder; a consecutive term of 30 years to life for the attempted murder, plus four years for the weapon and great bodily injury enhancements; and a consecutive term of 14 years to life for the aggravated mayhem offense. Sentence on simple mayhem was stayed pursuant to section 654. The court struck the section 667, subdivision (a)(1) serious felony enhancement.

Medrano filed a timely notice of appeal.

## DISCUSSION

1. *Failure to instruct on heat of passion voluntary manslaughter*

The trial court instructed the jury on first and second degree murder, "perfect" self-defense, and voluntary manslaughter on an imperfect self-defense theory. Defense counsel did not request, and the trial court did not give, an instruction on heat of passion voluntary manslaughter. Medrano now contends this omission was prejudicial error. We disagree.

a. *Applicable legal principles*

A trial court must instruct on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses, even in the absence of a request. (*People v.*

---

[8]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

10

*Smith* (2013) 57 Cal.4th 232, 239.)  Instruction on a lesser included offense is required when there is evidence the defendant is guilty of the lesser, but not the greater, offense.  (*People v. Landry* (2016) 2 Cal.5th 52, 98; *People v. Whalen* (2013) 56 Cal.4th 1, 68.)  This duty is not satisfied by instructing on only one theory if other theories are supported by the evidence.  (*People v. Lee* (1999) 20 Cal.4th 47, 61.)  Substantial evidence is that which a reasonable jury could find persuasive.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.)  The existence of *any* evidence, no matter how weak, will not justify an instruction (*Whalen*, at p. 68), but the testimony of a single witness, including the defendant, may suffice.  (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense.  (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)  In making this determination, we do not evaluate the credibility of the witnesses.  (*People v. Wyatt, supra*, 55 Cal.4th at p. 698.)  We view the evidence in the light most favorable to the defendant.  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; *People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser included offense of murder.  (§ 192, subd. (a); *People v. Nelson, supra*, 1 Cal.5th at p. 538; *People v. Moye* (2009) 47 Cal.4th 537, 549.)  A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary

in self-defense.  (*People v. Landry*, *supra*, 2 Cal.5th at p. 97; *Moye*, at p. 549.)

"The heat of passion sufficient to reduce murder to manslaughter 'exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " ' [Citation.]"  (*People v. Landry*, *supra*, 2 Cal.5th at p. 97.)  Thus, heat of passion manslaughter has both an objective and a subjective component.  (*People v. Moye*, *supra*, 47 Cal.4th at p. 549; *People v. Enraca* (2012) 53 Cal.4th 735, 759.)  As to the former, the "provocation which incites the defendant to homicidal conduct . . . must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim" (*People v. Lee*, *supra*, 20 Cal.4th at p. 59; *People v. Manriquez* (2005) 37 Cal.4th 547, 583), and must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, i.e., " 'from this passion rather than from judgment.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 939; *Enraca*, at p. 759.)  To satisfy the subjective component, the defendant must have killed while under the *actual* influence of such a strong passion induced by legally adequate provocation.  (*Moye*, at p. 550; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1139.)  The passion aroused may be any violent, intense, high-wrought or enthusiastic emotion other than revenge.  (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 174, 180; *Millbrook*, at p. 1139; *People v. Wright* (2015) 242 Cal.App.4th 1461, 1481.)  Substantial evidence to support an instruction may exist even in the face of

inconsistencies presented by the defense itself. (*In re Hampton* (2020) 48 Cal.App.5th 463, 480.)

   b. *Application here*

Medrano contends that his testimony regarding Federico's actions of groping his thigh, swinging the recycling bag at him, and pushing him amounted to legally adequate provocation. He further observes that a defendant's strong fear or panic can, in an appropriate case, provide evidence to support a heat of passion instruction, and he testified at trial that he was scared and panicked. (See *People v. Dominguez*, *supra*, 66 Cal.App.5th at p. 175; *People v. Millbrook*, *supra*, 222 Cal.App.4th at pp. 1138– 1139; *People v. Thomas* (2013) 218 Cal.App.4th 630, 645.) Although Medrano's trial testimony was more consistent with imperfect self-defense than a heat of passion theory, the two are not mutually exclusive, and instruction on both may be required. (See *Thomas*, at p. 645; *Dominguez*, at p. 180; *In re Hampton*, *supra*, 48 Cal.App.5th at pp. 480–481; *Millbrook*, at p. 1138.) The People concede that a heat of passion voluntary manslaughter instruction should have been given.

We need not decide whether the trial court erred by failing to sua sponte instruct on heat of passion voluntary manslaughter because the omission was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.)[9] Error in failing to

---

[9]   The appellate courts have come to different conclusions regarding whether the failure to instruct on a lesser included offense is evaluated under the federal beyond-a-reasonable-doubt standard articulated in *Chapman v. California*, *supra*, 386 U.S. 18, or under the state law reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818. (Compare, e.g., *People v. Dominguez*, *supra*, 66 Cal.App.5th at pp. 183–184 with *In re Hampton*, *supra*, 48 Cal.App.5th at pp. 481–482.) Our Supreme

instruct on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to the defendant under other, properly given instructions. (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 582; *People v. Elliot* (2005) 37 Cal.4th 453, 475; *People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Here, the jury found Medrano guilty of first degree murder. It was instructed that to render that verdict, it had to find beyond a reasonable doubt that Medrano committed the murder "willfully, deliberately, and with premeditation." CALCRIM No. 521 explained, "The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he *carefully weighed the considerations for and against his choice* and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death." "*A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.*" (Some italics added.) The instruction further stated that if the People failed to prove these elements beyond a reasonable doubt, "you must find the defendant not guilty of first degree murder and the murder is second degree murder."

In *People v. Wharton* (1991) 53 Cal.3d 522 (*Wharton*), our Supreme Court concluded that a failure to instruct that provocation could occur over time was harmless where the jury found the defendant guilty of willful, deliberate, and premeditated murder. The court explained: "By finding

---

Court is currently considering the question. (*People v. Schuller* (2021) 72 Cal.App.5th 221, 237, review granted Jan. 19, 2022, S272237.)

14

defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*Id.* at p. 572.)

The court found the same was true in regard to the failure to instruct on imperfect self-defense in *People v. Manriquez*, *supra*, 37 Cal.4th 547. There, the defendant was charged with four separate murders occurring on different occasions. (*Id.* at p. 551.) As to one of them, the murder of victim Baldia at the Rita Motel, the jury was instructed on heat of passion manslaughter, but the court declined a defense request to instruct on imperfect self-defense. (*Id.* at p. 580.) Our Supreme Court found the instruction was properly declined because no evidence in the record supported it. (*Id.* at pp. 581–582.) The court further reasoned: "The jury's verdict finding defendant guilty of the first degree murder of Efrem Baldia implicitly rejected defendant's version of the events, leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense. [Citation.] Accordingly, even if we were to assume the failure to instruct on imperfect self-defense violated defendant's constitutional rights, we would find the error harmless." (*Id.* at p. 582.)[10]

---

[10] Medrano contends that *Manriquez* is distinguishable from the instant matter and challenges the People's assertion that its analysis reinforced *Wharton's* reasoning. However, the portion of the case Medrano cites pertains to a different victim, Jose

15

Subsequent courts have come to the same conclusion. (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1071–1072 [because jury's finding that appellant premeditated and deliberated a killing was "manifestly inconsistent" with his having acted under the heat of passion, omission of heat of passion instruction was harmless beyond a reasonable doubt]; *People v. Franklin* (2018) 21 Cal.App.5th 881, 892–894; *People v. Peau* (2015) 236 Cal.App.4th 823, 830 [first degree murder conviction rendered any failure to give heat of passion instruction harmless under *Chapman*]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1246; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1138 [if jury had found attempted murder was willful, premeditated, and deliberate, "the finding would have been 'manifestly inconsistent with having acted under the heat of passion.' "]; cf. *People v. Wright*, *supra*, 242 Cal.App.4th at pp. 1497–1498 [true finding on lying-in-wait special circumstance showed defendant acted with premeditation and deliberation; that finding could not be reconciled with finding defendant lacked malice due to provocation and heat of passion].)

Medrano argues that *Wharton* is distinguishable for three reasons. First, he points out that in *Wharton*, the jury was

---

Gutierrez. As to *that* murder, *Manriquez* concluded the trial court did not err by failing to instruct on heat of passion voluntary manslaughter because there was insufficient evidence the defendant actually killed in the heat or passion, nor was there sufficient evidence of provocation. (*People v. Manriquez*, *supra*, 37 Cal.4th at pp. 583–585.) We agree that the Supreme Court's analysis as to the Gutierrez killing is distinguishable from the instant case, but this is not the portion of *Manriquez* that the People reference and that we address.

16

instructed on provocation and heat of passion; the flaw was that it was not instructed that provocation could occur over a considerable period of time. (*Wharton*, *supra*, 53 Cal.3d at pp. 569–572.) Here, in contrast, the jury was not given any heat of passion instruction. But in our view, this is a distinction without a difference. The salient aspect of our Supreme Court's reasoning in *Wharton* was that a finding of premeditation and deliberation is "manifestly inconsistent" with acting in the heat of passion. (*Id.* at p. 572.) That is equally true here.

Second, Medrano points out that in in *Wharton* the first degree murder instruction, CALJIC No. 8.20, stated that the decision to kill " 'must have been formed upon preexisting reflection and not upon sudden heat of passion.' " (*Wharton*, *supra*, 53 Cal.3d at p. 572.) The instruction given here—CALCRIM No. 521—omits the phrase "heat of passion." But again, this difference is of no moment. CALCRIM No. 521 conveys the same concepts as did CALJIC No. 8.20: that to prove first degree murder, the People were required to show the defendant intended to kill; "carefully weighed the considerations for and against his choice, and, knowing the consequences, decided to kill"; and "decided to kill before completing the act that caused death." There is no magic to the phrase "heat of passion" where, as here, the instruction conveyed the same principles.

Finally, Medrano contends *Wharton* applied the *Watson* standard, rather than the *Chapman* standard. This does not change our conclusion. For the reasons we have explained, the jury's first degree murder verdict demonstrates omission of the instruction was harmless under *Chapman*. *People v. Manriquez*, *supra*, 37 Cal.4th 547—deciding the conceptually identical issue of whether the omission of imperfect self-defense instructions was

17

erroneous—concluded the jury's first degree murder verdict eliminated "*any doubt*" that the jury would have returned the same verdict even if the instruction had been given. (*Id.* at p. 588, italics added.) Medrano does not explain how it would be possible for a jury to conclude a defendant's decision to kill, made after carefully weighing the considerations for and against his choice and knowing the consequences, could simultaneously have been made in the heat of passion, a state of mind in which reflection is eclipsed and a person " 'simply reacts from emotion due to the provocation, without deliberation or judgment.' " (*People v. Nelson, supra*, 1 Cal.5th at p. 539; *People v. Wang, supra*, 46 Cal.App.5th at p. 1072; see *People v. Franklin, supra*, 21 Cal.App.5th at p. 894.)

Medrano further contends that this case is controlled by *People v. Berry* (1976) 18 Cal.3d 509, rather than *Wharton.* *Berry* reversed a defendant's first degree murder conviction because the trial court erroneously refused to instruct on voluntary manslaughter on a heat of passion theory. (*Id.* at p. 518.) *Berry* reasoned that the first degree murder verdict did not necessarily indicate the jury found the defendant was not acting in the heat of passion when he killed. (*Ibid.*) The instructions given "only casually" referenced provocation and heat of passion, and there was no clear direction to consider the victim's provocatory conduct. (*Ibid.*)

*Wharton* was decided approximately fifteen years later. *Wharton* discussed *Berry*'s analysis on the provocation-over-time issue, but not the prejudice issue and, as explained above, found the error harmless due to the first degree murder verdict. (*Wharton, supra*, 53 Cal.3d at p. 572.)

Based on *Berry*, *People v. Ramirez* (2010) 189 Cal.App.4th 1483, rejected the argument that a trial court's error in failing to instruct on heat of passion voluntary manslaughter was harmless in light of the jury's first degree murder verdict. (*Id.* at pp. 1484, 1488.) Without citation to *Wharton*, *Ramirez* concluded the People's argument "fail[ed] as a matter of law" in light of *Berry*. (*Id.* at p. 1488.)

Since *Ramirez*, appellate courts have reconciled *Berry* and *Wharton* and concluded a first degree murder verdict renders errors in provocation and heat of passion instructions harmless. In *People v. Peau*, the court instructed that provocation could reduce a murder from first to second degree murder or to manslaughter, but did not instruct that the defendant was guilty of only voluntary manslaughter if he acted in the heat of passion. (*People v. Peau*, *supra*, 236 Cal.App.4th at pp. 828–829.) While recognizing that there was "some tension between the holdings" in *Berry* and *Wharton*, *Peau* reconciled the two. (*Id.* at p. 831.) The court explained: "Although *Berry* refused to find an error in omitting a heat-of-passion instruction harmless, it did not even mention that first degree murder must be willful, deliberate, and premeditated. Instead, it focused only on the fact that the instruction distinguishing between first and second degree murder in that case 'made passing reference to heat of passion and provocation for the purpose of distinguishing between' the two types of murder. [Citation.] We think this strongly suggests that the sole issue considered in *Berry* was whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation, not whether the error was harmless because the jury found the murder was willful, deliberate, and premeditated and such a

19

finding was inconsistent with a finding that the defendant acted in a heat of passion." (*Id.* at pp. 831–832.) Noting that cases are not authority for propositions not considered, the court "disagree[d] with the conclusion reached in *People v. Ramirez*, *supra*, 189 Cal.App.4th 1483 that *Berry* forecloses a determination that such an error is harmless for the latter reason." (*Id.* at p. 832.) *Peau* concluded any error was harmless beyond a reasonable doubt "because the jury necessarily rejected the possibility that [defendant] acted in the heat of passion by convicting him of first degree murder." (*Id.* at pp. 828, 832.)

In *People v. Franklin*, the jury was instructed on attempted voluntary manslaughter on a heat of passion theory, but the court's erroneous response to the jury's question was inconsistent with those instructions. (*People v. Franklin*, *supra*, 21 Cal.App.5th at pp. 886–890.) Agreeing with *Peau*, and focusing on the same language contained in the instructions given here, *Franklin* concluded the error was harmless. (*Id.* at p. 894.) "We cannot see how a determination that [defendant] carefully weighed his choice to act and did not decide rashly or impulsively can coexist with the heat of passion, which 'arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act *rashly and without deliberation* and reflection, and from such passion rather than from judgment." ' [Citation.] In other words, the jury's finding of premeditation and deliberation is 'manifestly inconsistent with having acted under the heat of passion' and nullifies any potential for prejudice here." (*Id.* at p. 894.)

We agree with the analyses in *Franklin* and *Peau*. Medrano argues that *Berry* is binding precedent, but so are

20

*Wharton* and *Manriquez,* and we conclude these latter cases compel rejection of Medrano's contentions.

Furthermore, even if the jury's first degree murder verdict were not by itself dispositive, given the evidence and the defense theory it is clear beyond a reasonable doubt that omission of a heat of passion instruction was harmless. Assuming the jury managed to overlook some of the less compelling aspects of Medrano's trial testimony—that he was attacked by not one but two random strangers in the park in unconnected incidents, that he happened to find a knife in the grass to defend himself at precisely the moment he needed it, and that he was terrified by two elderly men despite his youth and status as a trained boxer— his trial testimony regarding his mental state was contradicted by his statement to police.

Medrano's account of his state of mind in his police interview was incompatible with a heat of passion theory: he made it quite clear he acted according to a calculated "mission" to "take . . . out" the victims, whom he perceived as evil. For example, he explained, "They were, like evil. So, you know, I had to take care of the evil, take the evil out." He said he needed to "take care of a job" and "follow through with plans." He stabbed Federico in every "technical" spot he could find, using the moves he had learned growing up. He killed Federico because he was seeking "salvation." He also claimed he was defending himself. In short, he told police he committed a purposeful attack, and never suggested that he was acting without thinking due to intense emotions. (See *People v. Schuller, supra,* 72 Cal.App.5th at pp. 238–239, rev.gr. [evidence that defendant was not acting in any form of self-defense was overwhelming, in part because his "account of the killing radically changed leading up to trial."].)

Medrano's sudden turnabout in his trial testimony was not satisfactorily explained.[11]

Medrano's trial testimony provided minimal support for a heat of passion theory. Although he stated he was scared, and sometimes mentioned he was panicked, in shock, or frantic, the gist of his testimony was that he acted in self-defense, not because he was overcome by emotion that bypassed his thought processes. Being frightened does not by itself equate to heat of passion. To show heat of passion, " '[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649; *People v. Nelson, supra,* 1 Cal.5th at p. 539 [passion must eclipse reflection and cause the person to react from emotion without deliberation or judgment]; *People v. Rangel* (2016) 62 Cal.4th 1192, 1225 [" 'provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection.' "].) Medrano did not clearly testify he acted without thinking. And the defense theory was that Medrano acted in self-defense or imperfect self-defense; the defense did not argue that Medrano acted in the heat of passion.

---

[11] Citing *People v. Atkins* (2019) 31 Cal.App.5th 963, Medrano argues that this court may not consider whether his testimony was credible. Our observation that Medrano's statements to police contradicted his trial testimony is not a comment on his credibility, but simply an objective evaluation of the strength of the defense case, an appropriate consideration when determining prejudice. (See *People v. Ramirez, supra,* 189 Cal.App.4th at p. 1487 [strength of the evidence supporting the judgment is a relevant consideration in determining prejudice]; *People v. Schuller, supra,* 72 Cal.App.5th at pp. 239–240, rev.gr.)

Furthermore, the jury was given the option to convict Medrano of voluntary manslaughter on an imperfect self-defense theory, as well as second degree murder. CALCRIM No. 571 instructed that the crime was voluntary manslaughter if Medrano actually believed he was in imminent danger of being killed or suffering great bodily injury, actually believed the immediate use of deadly force was necessary to defend against the danger, and at least one of those beliefs was unreasonable. But the jury rejected this theory. There is authority that, in an appropriate case, a jury might reject imperfect self-defense but still find a defendant guilty of voluntary manslaughter on a heat of passion theory. (See *People v. Dominguez*, *supra*, 66 Cal.App.5th at p. 182 ["even if the jury did not believe that Defendants either reasonably or unreasonably thought deadly force was necessary—as jurors may have concluded in rejecting these theories—they could nevertheless have found that Defendants fired in the heat of passion."]; *In re Hampton*, *supra*, 48 Cal.App.5th at p. 481; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1138.)

But we fail to see how that was a genuine possibility here. The only strong emotion Medrano testified to was fear and panic. To find heat of passion but not imperfect self-defense, the jury would have had to conclude Medrano did *not s*ubjectively believe he was in danger and/or did *not* subjectively believe deadly force was necessary, but that this very same fear was strong enough to overcome his reason to such an extent that he acted from passion rather than reason, without thought. While this is possible in the abstract, we do not think it remotely likely that reasonable jurors would have come to this conclusion in this case. (See generally *People v. Moye*, *supra*, 47 Cal.4th at p. 557 ["Once the jury

23

rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense."].)

And it is not as though the jury had no option but to find Medrano guilty of first degree murder or nothing. Had it concluded that Medrano did not premeditate and deliberate, it could have found him guilty of second degree murder. "Thus, in convicting appellant of first degree rather than second degree murder, the jury necessarily found the evidence sufficient to establish premeditation and deliberation and also must have rejected the notion that appellant formed the intent to kill 'under a sudden heat of passion or other condition precluding the idea of deliberation.' " (*People v. Wang*, *supra*, 46 Cal.App.5th at p. 1071.)

Omission of the instruction, if error, was harmless beyond a reasonable doubt.

2. *The mayhem conviction*

Medrano was convicted of both aggravated mayhem (§ 205) and simple mayhem (§ 203). He contends that the simple mayhem conviction must be reversed because it is a lesser included offense of aggravated mayhem, and the People agree. So do we.

A defendant may be convicted of more than one offense based on the same act or course of conduct, but may not be convicted of two such offenses if one is a necessarily included lesser offense of the other. (*People v. Lopez* (2020) 9 Cal.5th 254,

24

269–270; *People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228; *People v. Robinson* (2014) 232 Cal.App.4th 69, 73–74.) To determine whether an offense cannot be committed without necessarily committing the included offense, we look to the statutory definitions of both offenses. (*Reed*, at pp. 1227–1229; *Robinson*, at p. 74.) "[I]f the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that the greater offense cannot be committed without also committing the lesser offense, the latter is necessarily included in the former." (*Robinson*, at p. 74.) Under this test, simple mayhem is a lesser necessarily included offense of aggravated mayhem. (*Id.* at pp. 73, 79.) Here, both convictions were based on the same act: Medrano's biting of Rolando's ear. Accordingly, Medrano's conviction for simple mayhem in count 4 must be reversed.

   3. *Correction of the minute order*

   The trial court's March 13, 2020, minute order reflects that the jury found true a great bodily injury enhancement (§ 12022.7, subd. (a)) on the simple mayhem conviction. The jury's verdict form on this count is comprised of two pages; the true finding on the section 12022.7 enhancement is on the second page. However, when the verdicts were read aloud and the jury was polled, the true finding was omitted. Medrano contends that the minute order must be corrected to delete the reference to the enhancement. The People agree. "The oral declaration of the jurors endorsing the result is the true return of the verdict." (*People v. Lankford* (1976) 55 Cal.App.3d 203, 211, disapproved on other grounds in *People v. Collins* (1976) 17 Cal.3d 687, 694–695, fn. 4.) Here, however, in light of our reversal of Medrano's conviction on this count, the issue is moot.

25

4. *Custody credits*

At sentencing, the trial court awarded Medrano 1,599 days of custody credit. Medrano contends he is entitled to one additional day of presentence custody credit and again, the People agree. Medrano was arrested on November 12, 2016 and was sentenced on March 30, 2021. A defendant is entitled to credit for the date of his arrest and the date of sentencing. (§ 2900.5, subd. (a); *People v. Denman* (2013) 218 Cal.App.4th 800, 814; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) Thus, taking into account that 2020 was a leap year, he is entitled to 1,600 days of presentence custody credit, rather than 1,599. A "sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 235.) We order the custody credit award corrected.

## DISPOSITION

Defendant's conviction in count 4, for simple mayhem (§ 203), is reversed.  The judgment is modified to reflect that Medrano is entitled to 1,600 days of presentence custody credit. In all other respects, the judgment is affirmed.  The clerk of the superior court is ordered to prepare an amended abstract of judgment reflecting the reversal of count 4 and the corrected custody credits, and to forward it to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

27